**In the Matter of Frank & Karen LOOMER, Debtors.**

**Richard BUTLER, Plaintiff,**

v.

**Frank & Karen LOOMER, Defendants.**

**Bankruptcy No. BK93–40297.**
**Adversary No. A94–4040.**

United States Bankruptcy Court.
D. Nebraska.

June 5, 1998.

See also 198 B.R. 755.

**620**

Richard J. Butler, Chapter 7 Trustee, Lincoln, NE.

Howard T. Duncan, Omaha, NE, for Defendants.

### MEMORANDUM

JOHN C. MINAHAN, Jr., Bankruptcy Judge.

In this adversary proceeding, the Chapter 7 Standing Trustee asserts that pre-petition voluntary contributions and loan repayments made by the debtor, Frank Loomer, to his ERISA-qualified retirement plan are avoidable preferences and/or fraudulent conveyances. I conclude that there was no preferential transfer, but that the voluntary contributions constitute avoidable fraudulent conveyances. I previously ruled that the trustee may not recover an avoidable transfer from the ERISA-qualified plan and I dismissed the plan administrator and plan trustees as party defendants to this case. *See In re Loomer,* 198 B.R. 755 (Bankr. D.Neb.1996). However, under Bankruptcy Code § 550, the debtor is liable to the trustee for the amount of the funds transferred because the debtor is the "entity for whose benefit the transfer was made."

### Findings of Fact

In 1990, Frank Loomer, Bob Michael, and Gene Hartis formed a corporation named Nebson, Inc. ("Nebson") for the purpose of constructing a Sonic Drive–In in Columbus, Nebraska. In August of 1990, Frank Loomer borrowed $30,728.94 from his retirement plan, and used these funds to make a capital contribution to Nebson. On December 4, 1990, Nebson borrowed $266,000.00 from Columbus State Bank (the "Bank") for use in the purchase of land and the construction of the drive-in. Repayment of the loan was guaranteed by Mr. Michael, Mr. Hartis, and Mr. Loomer.

In March of 1991, during the construction of the drive-in, it was discovered that Mr. Michael embezzled at least $27,000 from Nebson. Shortly thereafter, Mr. Hartis and Mr. Loomer formed a new corporation, Sonic Drive–In of Columbus ("Sonic–Columbus"), and continued constructing the drive-in. Due to the embezzlement, there was a shortage of funds and Mr. Loomer and Mr. Hartis contributed a significant amount of their own labor in finishing the construction project. The drive-in opened for business on May 19, 1991. On May 20, 1991, Sonic–Columbus borrowed funds from the Bank to pay for restaurant equipment. This loan was personally guaranteed by Mr. Loomer and Mr. Hartis. Mr. Loomer and his wife, Karen,

granted the Bank a second lien on their house to partially secure the repayment of this loan.

Although the drive-in initially experienced substantial business, it did not produce sufficient income to make payments to the Bank and other business creditors when due. On September 12, 1991, Sonic Industries, Inc. declared a breach of the franchise agreement, and requested the return of its restaurant equipment or payment of the unpaid balance of $58,000. The drive-in closed on November 30, 1991, and on December 9, 1991, Sonic Industries, Inc. sued the Bank, Mr. Loomer, and Mr. Hartis for breach of contract with respect to the purchase of restaurant equipment.

The Bank took possession of the drive-in on April 15, 1992, and sold it under a deed of trust on July 6, 1992, for $207,119. On August 21, 1992, the Bank sued Mr. Loomer on his guarantee of the loan made to Nebson for a deficiency of $85,557.84. In February of 1993, the Bank sold the debtors' house under a deed of trust and sued to evict the debtors from the house. Mr. Loomer and his wife filed this bankruptcy petition as debtors on March 5, 1993 (the "Petition Date").

Mr. Loomer's employer had established an ERISA-qualified retirement plan for its employees. Mr. Loomer made voluntary contributions to his retirement plan from 1987 up through the Petition Date. Initially, the contributions were 12% of Mr. Loomer's salary. On August 1, 1991, he reduced his contributions to 6% of his salary. In addition, from August 1990, when Mr. Loomer borrowed the $30,728.94 from his plan for contribution to Nebson, until the Petition Date, Mr. Loomer made monthly repayments to the retirement plan on this loan through automatic payroll deductions.

The Chapter 7 trustee asserts that the voluntary contributions and loan repayments made by Mr. Loomer to his retirement plan constitute avoidable preferences and/or fraudulent conveyances. The trustee seeks to recover the amount of the transferred funds from Mr. Loomer. I previously ruled that the Chapter 7 trustee could not recover any preferential payments or fraudulent conveyances from the retirement plan itself, because the plan is ERISA-qualified and subject to ERISA's restrictions on voluntary and involuntary alienation. *See Loomer supra.*

*Law*

Under the Bankruptcy Code, certain transfers of property by the debtor made prior to commencement of a bankruptcy case may be avoided. The elements of an avoidable preferential transfer are set forth in § 547(b). However, even if all the elements of a preferential transfer are present, transfers made in the ordinary course of business may not be avoided. *See* § 547(c)(2).

Section 548 permits avoidance of transfers made with the specific intent to hinder, delay, or defraud creditors. Section 548 also permits avoidance of transfers made by an insolvent debtor for less than reasonably equivalent value. *See* § 548(a). Under § 544(b), the Chapter 7 trustee may avoid any transfer avoidable by any actual unsecured creditor under state law, including fraudulent conveyance laws. Nebraska has adopted the Uniform Fraudulent Transfer Act (the "UFTA"). *Neb.Rev.Stat.* §§ 36–701 through 36–712. Under the UFTA, fraudulent transfers made within the previous 4 years may be avoided. *Neb.Rev.Stat.* § 36–710. Under § 544, the trustee is, in effect, subrogated to the position of an actual creditor with an allowed claim and, as a condition to invoking § 544(b), the trustee must establish the existence of an actual creditor with the right to avoid the challenged transfer.

To the extent a transfer is avoided under sections 544, 547, or 548, the trustee may recover the value of such property from the entity for whose benefit the transfer was made. *See* § 550(a)(1). The normal remedy under § 550(a) is to set aside the transfer, but that remedy is not available on the facts of this case due to ERISA's anti-alienation provisions. *See Loomer supra.*

*Discussion*

*Voluntary Contributions*

Although there was no preferential transfer and no constructive fraudulent transfer, I conclude that voluntary contributions made by Mr. Loomer after September 12, 1991, were made with the actual intent to hinder or delay creditors and, as such, are avoidable.

■ One requisite for a preference is that the transfer be for or on account of antecedent debt. *See* § 547(b)(2). The voluntary contributions to Mr. Loomer's retirement plan were not made in payment of antecedent debt; they were contributions for his own benefit. Voluntary contributions to the retirement plan are not preferences under the Bankruptcy Code because they are not transfers for or on account of an antecedent debt.

■ Mr. Loomer received reasonably equivalent value for his voluntary contributions because his retirement account balance increased by the amount of each contribution. Because Mr. Loomer received reasonably equivalent value for his voluntary contributions, the transfers may not be avoided as constructively fraudulent transfers by an insolvent debtor.

■ However, the voluntary contributions made by Mr. Loomer after September 12, 1991, were made with the actual intent to hinder, delay, or defraud creditors, and are avoidable fraudulent transfers under section 548(a)(1) of the Bankruptcy Code, and section 36–705(a)(1) of the UFTA. In concluding that these transfers were made with fraudulent intent, I have considered the facts and circumstances which existed during the time the debtor made voluntary contributions to the retirement plan. Some of those facts and circumstances are badges or indicia of fraud from which I conclude that actual intent to hinder or delay creditors existed.

Although there had been a series of financial problems, there was some hope that the Sonic Drive–In would be successful until some time before September 12, 1991. On that date, Sonic Industries, Inc. declared breach of the franchise agreement and requested return of the restaurant equipment or the payment of the $58,000.00 balance of the purchase price. As of that date, the drive-in had failed and Mr. Loomer knew it had failed. As of that date, or earlier, Mr. Loomer knew that he would not be able to repay the Bank's loan, he knew he would not be able to pay his obligations to Sonic Industries, Inc., and he knew he would not be able to pay other debts. By September 12, 1991, Mr. Loomer's financial resources were completely exhausted, and his debts exceeded his ability to pay. Yet, after September 12, 1991, Mr. Loomer continued to make voluntary contributions to his ERISA-qualified retirement plan, thus placing the contributions beyond the reach of his creditors. I conclude that contributions made after September 12, 1991, were fraudulent transfers made with the intent to hinder, delay, or defraud creditors.

■ I reach this conclusion on the facts stated, and take no inference from the conversion of non-exempt property into the ERISA-qualified plan. The conversion of property into an ERISA-qualified plan, or into exempt property is not an indicia or badge of fraud. There must be extrinsic evidence that the transfers were fraudulent. *See Norwest Bank Nebraska, N.A. v. Tveten,* 848 F.2d 871, 876 (8th Cir.1988), *Panuska v. Johnson,* 880 F.2d 78, 82 (8th Cir.1989).

Mr. Loomer made voluntary contributions to his retirement plan of $235.36/month in 1991 and 1992, and $244.50/month in 1993. Thus, his total voluntary contributions from September 12, 1991, until March 5, 1993, were $4,263.90 ($235.36 × 15, + $244.50 × 3), and these contributions constitute avoidable fraudulent transfers which may be recovered from Mr. Frank Loomer.

*Loan Repayments*

■ Although all the elements of a preferential transfer are arguably present with respect to the loan repayments made by the debtor, the transfers were made in the ordinary course of business and are therefore not avoidable. The repayments were made in the ordinary course of business as between the debtor and the retirement plan, as well as in the ordinary course of business of retirement plans in general. There has been no showing that the repayments were extraordinary in any way, or that they were made in a manner different than Mr. Loomer's repayments of previous loans from his retirement plan. Therefore, the ordinary course of business exceptions apply and the loan repayments are not preferences. *See* 11 U.S.C. § 547(c)(2) and § 36–709(f) of the UFTA.

■ The next question is whether the loan repayments were fraudulent transfers. The payments were made while the debtor was insolvent, however, he received reasonably equivalent value for the transfers because the loan balance decreased and his equity in his retirement plan increased by the amount of the repayments. Therefore, the constructive fraud provisions of the Code and the UFTA do not apply. The question becomes whether the debtor made the loan repayments with the specific intent to hinder, delay, or defraud his creditors.

■ At the time the loan repayments were made, the same badges of fraud were present as were present with regard to the voluntary contributions. However, in my view, the inference of fraudulent intent is rebutted by the fact that these transfers were simply payments on a bona fide preexisting loan. The debtor was legally obligated to make payments in accordance with a payment schedule that was formulated in a bona fide transaction prior to the time the debtor experienced financial difficulties. The loan was obtained while the debtor was solvent. I conclude that the debtor did not make the loan repayments with the specific intent to hinder, delay, or defraud creditors.

*Conclusion*

The voluntary retirement plan contributions aggregating $4,263.90, which were made by Mr. Loomer between September 12, 1991, and the filing of the bankruptcy petition were made with the intent to hinder or delay creditors and constitute avoidable transfers. Mr. Loomer, as the entity who benefited from the transfer is liable for that amount to the Chapter 7 trustee. In addition, Mr. Loomer is liable to the Chapter 7 trustee for interest at the legal rate which shall accrue from the date this adversary proceeding was commenced. Under the facts of this case, Mr. Loomer has had the use and enjoyment of these funds and they have been continually invested in his retirement account. Under these circumstances, I conclude it is equitable for him to pay interest. *See In re Investment Bankers, Inc.,* 4 F.3d 1556, 1566 (10th Cir.1993), *cert. denied,* 510 U.S. 1114, 114 S.Ct. 1061, 127 L.Ed.2d

381 (1994); *In re Bellanca Aircraft Corp.,* 850 F.2d 1275 (8th Cir.1988). A separate order will entered consistent herewith.

IT IS SO ORDERED.