In the Matter of Wayne L.
PULLIAM, Debtor.

William M. Flatau, Chapter
7 Trustee, Plaintiff,

v.

Wachovia Securities, Inc., and Wayne
L. Pulliam, Defendant.

Bankruptcy No. 00–31502 RFH.
Adversary No. 01–3015.

United States Bankruptcy Court,
M.D. Georgia,
Athens Division.

June 18, 2002.

William M. Flatau, Macon, GA, Chapter 7 Trustee.

John T. McGoldrick, Jr., Michael N. White, Macon, GA, for Wachovia Securities, Inc.

Ernest V. Harris, Athens, GA, for Wayne L. Pulliam.

### MEMORANDUM OPINION

ROBERT F. HERSHNER, Jr., Chief Judge.

William M. Flatau, Chapter 7 Trustee, Plaintiff, filed on April 26, 2001, a Complaint to Avoid Transfer. Wachovia Securities, Inc., Defendant, filed a response on May 25, 2001. Wayne L. Pulliam filed a response on May 29, 2001. A hearing was held on July 11, 2001. The Court entered an order on May 31, 2002, allowing Mr. Pulliam to intervene as a defendant. The Court will refer to Mr. Pulliam as Defendant and to Wachovia Securities, Inc., as Wachovia. The Court, having considered the evidence presented and the arguments of counsel, now publishes this memorandum opinion.

### FINDINGS OF FACT

Defendant opened an Individual Retirement Account at SunTrust Bank in the 1980s. Defendant, around 1997, rolled over[1] his IRA at SunTrust into an IRA at Wachovia. The funds in Defendant's IRA at Wachovia were invested in mutual funds.

Defendant, in 1999, started a business known as Kim–Kris–Wood, Inc. Defendant and his wife were the sole shareholders of the corporation. Defendant was the president and was a full-time employee of the corporation. Defendant testified that he "cashed in" his 401(k) retirement plan[2] to meet his living expenses when Kim–Kris–Wood, Inc. began operations.

---

1. A rollover is a tax-free distribution of assets from one retirement plan to another retirement plan. The contribution to the second retirement plan is called a "rollover contribution." Individual Retirement Arrangements (IRAs), Internal Revenue Service Publication 590, p. 20 (2001).

2. Defendant's IRA and his 401(k) retirement plan were separate accounts.

Pinnacle Bank provided financing for Kim–Kris–Wood, Inc. The corporation had financial problems. Pinnacle Bank, in the summer of 2000, notified Defendant that the bank would not provide further financing to Kim–Kris–Wood, Inc.

Ligna Machinery, Inc. filed on August 2, 2000, a complaint in state court against Kim–Kris–Wood, Inc. and against Defendant as guarantor of the corporation's obligation. Ligna Machinery, Inc. sought a judgment for $214,621.01.

Defendant decided to withdraw the funds in his IRA at Wachovia.[3] Defendant testified that the mutual funds in his IRA were not performing. Defendant testified that he would not have withdrawn the funds if he had been satisfied with the performance of his IRA. Defendant also testified that he intended to use the funds to pay "past and future creditors."

The mutual funds in Defendant's IRA were sold on September 1 and 15, 2000. Wachovia Bank, N.A. issued Defendant an "Official Check"[4] dated September 18, 2000, for the net proceeds in the amount of $40,087.07. Defendant's daughter picked up the check at Wachovia on September 22, 2000, and delivered the check to Defendant.

Defendant put the check in a drawer at his residence. Defendant testified that he did not know where he wanted to invest the funds or if he would need the funds to meet his living expenses. Defendant understood that he had sixty days to decide.[5]

Defendant, some two weeks later, took the check to the residence of his father-in-law, Jay Haywood. Defendant offered the check to Mr. Haywood to repay loans that Mr. Haywood had made to Defendant. Defendant testified that he believed that Mr. Haywood would continue to help him, but that his other creditors would not. Mr. Haywood would not accept the check. Defendant left the check at Mr. Haywood's residence. About a week later, Mr. Haywood told Defendant to "forget it, you don't owe me."

Kim–Kris–Wood, Inc. closed its business during the first or second week of October of 2000.

Defendant's wife signed a check dated October 10, 2000, for $3,900 to prepay for eye surgery for Defendant's adult daughter.[6] Defendant testified that his daughter attends college and that he is "still looking after her."

The Citizens Bank of Washington County filed on October 20, 2000, a complaint in state court against Defendant. The bank sought a judgment in the principal amount of $241,600.58.

Defendant's wife signed a check dated October 24, 2000, for $1,000 payable to ICM, a religious ministry. Defendant testified that this check was his tithe.

Defendant met with Ernest Harris, a bankruptcy attorney, on November 10, 2000. Defendant discussed his financial problems with Mr. Harris. After meeting with Mr. Harris, Defendant understood that he could claim his IRA in his exemp-

---

**3.** A withdrawal is referred to as a distribution.

**4.** An official check is a check that a bank draws on itself. Cashier's checks are often labeled as official checks. 12 C.F.R. Pt. 229.2(i), App. E. Commentary.

**5.** Defendant's IRA distribution would result in a ten percent tax penalty unless the distribu-

tion was "rolled over" into another IRA within sixty days after the date that Defendant received the distribution. *See* 26 U.S.C.A. § 408(d)(3) (West Supp.2001).

**6.** Defendant and his wife had a joint checking account.

tions if he filed for bankruptcy relief. Defendant signed a check dated November 10, 2000, for $1,700 as a retainer for Mr. Harris's legal services.

Defendant went to his father-in-law's residence and picked up his IRA distribution check. Defendant's sixty-day window to roll over his IRA distribution was about to expire. Defendant endorsed the distribution check over to Wachovia on November 24, 2000. The transaction was treated as a rollover by Wachovia and Defendant. The funds were used to purchase certain mutual funds on November 29, 2000. Defendant admits that he was insolvent and unemployed at that time.[7] Wachovia is the custodian of Defendant's IRA.[8]

Defendant filed a petition for bankruptcy relief on December 4, 2000. Defendant's bankruptcy estate has no assets available for distribution to unsecured creditors. Defendant claimed as exempt property his IRA at Wachovia in the amount of $40,000. Defendant is not currently employed.

The Court entered an order and memorandum opinion on March 26, 2002, determining that Defendant could not claim as exempt his IRA because, under applicable state law, an IRA is not property of his bankruptcy estate. *See In re Pulliam,* Ch. 7 Case No. 00–31502 RFH, 2002 WL 843926 (order entered March 26, 2002).

### CONCLUSIONS OF LAW

Plaintiff seeks to recover the funds in Defendant's IRA. Plaintiff contends that, on the eve of bankruptcy, Defendant converted his IRA distribution check into an IRA with actual intent to hinder, delay, or defraud creditors.[9]

Section 548(a)(1)(A) of the Bankruptcy Code [10] provides:

### § 548. Fraudulent transfers and obligations

(a)(1) The trustee may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within one year before the date of the filing of the petition, if the debtor voluntarily or involuntarily-

(A) made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted; or

11 U.S.C.A. § 548(a)(1)(A) (West Supp. 2002).

Section 550(a) of the Bankruptcy Code [11] provides:

### § 550. Liability of transferee of avoided transfer

(a) Except as otherwise provided in this section, to the extent that a transfer is avoided under section 544, 545, 547, 548, 549, 553(b), or 724(a) of this title, the trustee may recover, for the benefit of the estate, the property transferred,

---

7. Defendant concedes that his liabilities exceeded his assets by $4.5 million. *See* Defendant's letter brief, p. 3 (filed Aug. 2, 2001). This letter brief is filed in Defendant's bankruptcy case, not in this adversary proceeding.

8. The face of Defendant's IRA provides, in part:
   WAYNE PULLIAM IRA
   WSI AS CUSTODIAN
   PO BOX 183
   WATKINSVILLE GA 30677

9. Plaintiff has not pursued his contention that Defendant received less than a reasonably equivalent value from the transfer.

10. 11 U.S.C.A. § 548(a)(1)(A) (West Supp. 2002).

11. 11 U.S.C.A. § 550(a) (West 1993).

or, if the court so orders, the value of such property, from—

(1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or

(2) any immediate or mediate transferee of such initial transferee.

11 U.S.C.A. § 550(a) (West 1993).

■ Plaintiff bears the burden of proving all facts necessary to prove that a fraudulent transfer occurred. *Harris v. Huff (In re Huff)*, 160 B.R. 256, 260 (Bankr.M.D.Ga.1993).

■ Defendant contends that there was no "transfer" because he did not dispose of or part with an interest in property. Defendant argues that he owned the IRA distribution check and that he currently owns the IRA. Defendant argues that he can withdraw the funds in the IRA and has total control over how the funds are invested.

The Court is not persuaded by Defendant's argument. Transfer is defined in section 101(54) of the Bankruptcy Code.[12] The legislative history to this section provides, in part:

> Paragraph (40) [(54)] defines "transfer." ... A transfer is a disposition of an interest in property. The definition of transfer is as broad as possible.... Under this definition, any transfer of an interest in property is a transfer, including a transfer of possession, custody or control even if there is no transfer of title, because possession, custody, and control are interests in property. A deposit in a bank account or similar account is a transfer.

(S.Rep. No. 95–989, 95th Cong.2d Sess. 27 (1978), U.S.Code Cong. & Admin.News 1978, pp. 5787, 5813).

See *Village of San Jose v. McWilliams*, 284 F.3d 785, 793 (7th Cir.2002) (citing legislative history of definition of transfer); *Bernard v. Sheaffer (In re Bernard)*, 96 F.3d 1279, 1282 (9th Cir.1996) (same).

■ Thus, a transfer includes a change of possession or custody. The face of Defendant's IRA shows that Wachovia Securities, Inc. is the custodian. The testimony and evidence shows that possession or custody of the funds at issue changed from Defendant to Wachovia. Defendant's transfer effectively removed the funds from the reach of his creditors.[13] The Court is persuaded that Defendant "transferred" the funds at issue.

■ Defendant contends that a rollover of funds into an IRA is not a fraudulent transfer. Respondent relies upon *Shaia v. Meyer (In re Meyer)*, 244 F.3d 352 (4th Cir.), *cert. denied*, —— U.S. ——, 122 S.Ct. 212, 151 L.Ed.2d 150 (2001) (debtor received valuable consideration under Virginia law when debtor used cash from specific bequest under deceased father's will to prepay mortgage on debtor's residence; release of secured debt is valuable consideration for prepayment of mortgage); *Love v. Menick*, 341 F.2d 680 (9th Cir. 1965) (cash value of surrendered, potentially exempt, life insurance policy deposited, upon advice of counsel, into exempt bank

---

12. This section provides as follows:

**§ 101. Definitions**

In this title—

....

(54) "transfer" means every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with property or with an interest in property, including retention of title as a security interest and foreclosure of the debtor's equity of redemption;

11 U.S.C.A. § 101(54) (West Supp.2002).

13. Funds in an IRA generally are not subject to garnishment until paid to the member. O.C.G.A. § 18–4–22 (1999).

account cannot be held, by itself, to constitute fraud); and *In re Simms,* 243 B.R. 156 (Bankr.S.D.Fla.2000) (debtors sold homestead and used the potentially exempt proceeds to purchase an exempt annuity; debtors had health problems and filed for bankruptcy relief six months after the annuity was purchased; no evidence that debtors did not intent to pay consumer debts after annuity purchased, no creditors had begun serious collection efforts, and debtors did not attempt to conceal the conversion).

Defendant also relies upon *Ransier v. Public Employees Retirement System (In re Cottrill),* 118 B.R. 535 (Bankr.S.D.Ohio 1990). In that case, Mr. Cottrill, while preparing for retirement, learned that he could receive retirement credit for his military service upon payment of a sum certain into his public employer's retirement system. Mr. Cottrill withdrew funds from his deferred compensation program and deposited the funds in his checking account. Some three weeks later, Mr. Cottrill transferred the funds to his employer's retirement system to purchase additional credits for his military service. Mr. Cottrill took early retirement the next month. Mr. Cottrill and his wife filed for bankruptcy relief two months later when they discovered their retirement benefits were not sufficient to meet their living expenses. Mr. Cottrill died seven months later.

The Chapter 7 trustee contended that Mr. Cottrill did not receive reasonably equivalent value in exchange for the transfer of funds from his deferred compensation program into his employer's retirement system. The trustee conceded that the transfer was not made with fraudulent intent. The bankruptcy court determined that Mr. Cottrill was not attempting to transfer an asset to his wife in order to protect the asset from creditors. The bankruptcy court also noted that the trustee had failed to present any evidence to support his contention that Mr. Cottrill had not received reasonably equivalent value.

The bankruptcy court stated:

Additionally, because Mr. Cottrill essentially "rolled-over" money from one exempt retirement fund into another, the transfer cannot be considered fraudulent within the meaning of § 548.... Thus, under Ohio law, both the PERS and Deferred Compensation fund are clearly exempt from property of a debtor's estate. The temporary transfer of the Deferred Compensation funds into Mr. Cottrill's checking account, for the purpose of rolling over the funds into the PERS plan, did not cause the asset to lose its exempt status. The only way Mr. Cottrill could transfer the funds to PERS was to act as the intermediary, and personally transfer the money from one plan to the other. This is evidenced by the fact that the State provides no means of rolling over funds from one retirement plan to another, and by the fact that the money remained in Mr. Cottrill's checking account for less than three weeks.

In *Love v. Menick,* 341 F.2d 680, 682 (9th Cir.1965), the Ninth Circuit Court of Appeals was faced with a similar situation to the instant case and held: "the deposit of money derived from surrender of an asset, a portion of which, absent surrender, would have already been exempt ... into an account of exempt quality, cannot be held, of itself, to constitute fraud." In *Love,* a debtor surrendered his life insurance policy for its cash value, and deposited the cash into a savings and loan association. Although this transaction took place only a few days before the debtor voluntarily filed a petition for bankruptcy, the court held that because under state law both assets

were of exempt status, the transaction was not fraudulent. Similarly, Mr. Cottrill transferred money from one exempt retirement fund into another exempt retirement fund. The temporary placement of the money in Mr. Cottrill's personal checking account for the *specific purpose* of transferring the funds, did not cause the asset to lose its exempt status, nor was the transfer fraudulent.

Furthermore, even if the funds did lose their exempt status when they were placed in Mr. Cottrill's checking account, the subsequent transfer of money to PERS is still not fraudulent. It is well established that the mere conversion of property from nonexempt to exempt status on the eve of bankruptcy does not constitute fraud. *In re Beckman,* 104 B.R. 866 (Bankr.S.D.Ohio 1989). Pre-bankruptcy planning permits the debtor to make full use of the exemptions to which he is entitled, and is not fraudulent as to creditors. *Beckman,* at 870. There being no evidence of fraudulent intent, the Court is not inclined to infer fraudulent intent simply by virtue of pre-retirement or pre-bankruptcy planning by the Debtors.

118 B.R. at 538–39 (emphasis added).

The Court is not persuaded by Defendant's argument. Defendant, when he withdrew the funds from his IRA, did not have a "specific intent" of depositing the funds into another IRA. Defendant offered to use the funds to pay a family member, his father-in-law, to the exclusion of his other creditors. Defendant was insolvent, unemployed, and had learned that he could shield funds in an IRA from his creditors. Defendant's transfer was back to the same custodian, Wachovia. This is not a typical rollover of IRA funds.

The Court now turns to consider whether Defendant acted with fraudulent intent. Courts consider certain "badges of fraud" in determining whether a debtor acted with actual intent to hinder, delay, or defraud creditors. *Dionne v. Keating (In re XYZ Options, Inc.),* 154 F.3d 1262, 1271 (11th Cir.1998).

In *Levine v. Weissing (In re Lewis),*[14] the Eleventh Circuit Court of Appeals stated:

In determining whether a debtor actually intended to hinder, delay, or defraud a creditor, a bankruptcy judge may consider, *inter alia,* whether:

(a) The transfer or obligation was to an insider.

(b) The debtor retained possession or control of the property transferred after the transfer.

(c) The transfer or obligation was disclosed or concealed.

(d) Before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit.

(e) The transfer was of substantially all the debtor's assets.

(f) The debtor absconded.

(g) The debtor removed or concealed assets.

(h) The value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred.

(i) The debtor was insolvent or became insolvent shortly after the transfer was made or the obligation incurred.

(j) The transfer occurred shortly before or shortly after a substantial debt was incurred.

---

14. 134 F.3d 1046 (11th Cir.1998).

(k) The debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

134 F.3d at 1053.

■ "Although the presence of one specific 'badge' will not be sufficient to establish fraudulent intent, the 'confluence of several can constitute conclusive evidence of an actual intent to defraud.'" *Dionne v. Keating (In re XYZ Options, Inc.)*, 154 F.3d at 1271 n. 17.

Turning to the case at bar, the evidence shows that Defendant converted his IRA distribution check into an IRA about two weeks after meeting with a bankruptcy attorney. The IRA was opened at Wachovia, the same custodian that held Defendant's prior IRA. Defendant understood that his IRA could be claimed as exempt property. Defendant retains ownership of the funds after the transfer. The transfer was made ten days before Defendant filed for bankruptcy relief. Defendant was insolvent and unemployed. Defendant had few, if any, other unencumbered assets. Defendant had offered to use his IRA distribution check to pay a family member, Defendant's father-in-law.

The Court is persuaded that Defendant "intended to shield what he thought was valuable property from the claims of his creditors." *Future Time, Inc. v. Yates*, 26 B.R. 1006, 1009 (M.D.Ga.) (Owens, J.), *aff'd*, 712 F.2d 1417 (11th Cir.1983). The Court is persuaded that Defendant converted his IRA distribution check into an IRA with actual intent to hinder, delay, or defraud creditors.

An order in accordance with this memorandum opinion will be entered this date.